The next case called for hearing is 5-13-0042, Nancy Wood McElmeel v. Shedelbower. If I butchered those names, I apologize. Mr. Clark and Mr. Berkey. Okay, Mr. Clark. And please support Mr. Berkey. This case comes before this court in Jasper County. Essentially, it involves a dispute as to the 40-acre tract. There's a sketchy record title history to this 40-acre tract. Sketchy as you can be kind. There's a claim on behalf of my client to adverse possession. The case is, at least I believe, and I think it's fair to allow us to answer the question, the nature of the initial entry by my client on the 40-acre tract, the permissive or adverse nature of that entry. You don't dispute that they took possession with the permission of the owners. Oh, yes, well, let me answer that the way I need to answer that. At the time of the entry, in 1968, there were multiple owners of this 40-acre tract. Our best guess is 72 plus or minus. Two of those owners spoke with and authorized my client's entry onto this 40-acre tract. The other owners, in other words, a vast majority of the owners did not consent, authorize, or permit my client's entry onto that 40-acre tract. In that, your honor, in our mind is a very critical point. From the perspective of this whole issue, the permissive or adverse entry onto the property on day one, it seems to me that the owners can be, for analytical purposes, divided into three categories. The first category is the plaintiff, Nancy Wood McGowan. She is ultimately, through her chain of title, one of the fractional interest owners in this 40-acre tract. As it turned out in the trial court, as a result of the trial court's judgment and order, she owned 100 percent of this 40-acre tract. Now, as to her, and ultimately, she is the most critically important owner of this tract. She is the one who brought this litigation. She is the one who ultimately was found by the trial court, to the exclusion of the other owners, to be the sole owner, the 100 percent owner, of this 40-acre tract. So, as to her, and her chain of title, in 19, as it turns out, in 1968, when my client entered onto this 40-acre tract, it was not done with the consent of her chain in this title. Her chain comes through a fellow by the name of Leo Huber, her granddad, and it then went to her mom, and then on to her. So, on day one, when the entry was made by my client onto the 40-acre tract, it was not done with the permission of Leo Huber, the granddad of Nancy Wood McGowan, number one. Number two, and we cite in our brief case, a 5th District case, that basically says, would we have jointly-owned property, there can be an ouster by one co-owner or other co-owners by some act. Is that the Gensington? Correct. Are you claiming an ouster by a co-tenant? Are we claiming that? Well, not only are we claiming that, that was pled by Nancy Wood McGowan in her complaint. So, yes, that's part of it. Okay. Well, I mean, I can see that you're claiming adverse possession as to heirs who did not, heirs or co-tenants who did not give permission. Correct. Included, again, a primary cause. Right. In her line of title. In her line of title. Correct. So you do concede that they were given permission to use the property by, I think it's Christine and Henry? Exactly. By those two and those two only. Yeah, that is, that's what the evidence was. I don't think there is any dispute as to that particular fact, and that's what caused my client to enter the property in 1968, in a conversation with those two co-owners that you just mentioned. Do you dispute the contention that someone in the Huber family and Evelyn, Evelyn promptly reimbursed the defendants for their one-time payment? Someone in the Huber family always paid it. And there was one payment that was reimbursed. You're now addressing the real estate taxes. Correct. And the real estate taxes, the evidence, the evidence was that during the lifetime of Henry, he paid the real estate taxes. He passed away, I forget the exact year, but it was in the 1980s. My client paid them one year, but was reimbursed by Nancy Wood MacDowell's mother, who then paid the taxes that year, from that year forward. I saw some discussion about whether or not your clients improved the property after the home burned down. Do you know, did they make such improvements, like electricity, water? Well, improvement is kind of a funny word, but let me answer what I think the evidence was. Mobile homes, two mobile homes over the years were moved out of the property. There's a portion of the acreage that is tillable, and that was farmed. But I saw they had no electricity or water in the house. I was wondering when they moved the mobile homes in, did they then make improvements? Because it seems the court found there were none, except the tillable land, which isn't really an improvement. I guess they're taking harvest. There was evidence that there was an extension. I'm speaking from memory, Your Honor. An extension of a garage or something. Okay, thank you. Let me ask another question here. I'm just trying to see where we're going with this. Sure. So are you saying that a person can obtain permissive possession of property from, say, the one-quarter owner of property, and then obtain the other three-quarters by adverse possession as to the other co-tenants? Yes. Yes, I think that's exactly what I'm saying. So in that kind of a case, all the other co-tenants would have to come in and prove that they didn't permit it separately in order to keep their interest. To keep their interest. I mean, doesn't adverse possession have to be open, hostile, adverse to all the world? Well, clearly the possession was open to all the world. Clearly it was open, notorious, hostile in the sense that the evidence was that over the years, and this is a 40-plus-some-year period of time, there were people who approached my clients for shadow power, including part of this Huber family chain, with requests to cut timber, with requests to hunt on the ground, things of that nature, which the evidence was denying. So I hope I'm answering your question as best I can. I'm having trouble. If there were eight people and two didn't concede that they were given permission, how does that give them adverse possession? Even if there were two out of 20? Well, if, and again, I think we go back to this proposition in this Ginsey case, that one co-owner can take an act which essentially acts as an active ouster as to the other co-owners. That was a case, though, where the co-owner was claiming adverse possession against their co-owner. Sure, sure. I wasn't fortunate enough to find a case as close as I could. But, you know, on this point, and I apologize to the Court for repeating myself a little bit, but on this particular point, this point of ouster, which is a significant point, I think, we have not only that case, but we have a plea where the plaintiff pleads that that's exactly what happened, that effectively all co-owners were ousted by these two co-owners. And we're talking about, and let me just emphasize this a little bit, you know, ownership of a force or ace or something. This is way beyond that. This is multiples of that. It's, I won't say it's impossible, but I think it's fair to say it is close to impossible to track this record title through where everything ended up. It's just a massive leak. It's frankly the sketchiest record title change that I've ever seen. You wouldn't loan money on it. Probably not. Probably not. You know, just as a follow-up point, the Court, relying on two different statutes, found ownership in the plaintiff. And those two statutes, one specifically says it doesn't apply where there's adverse possession. The other says it doesn't apply where there's a personal possession of the claim of ownership. So we, I don't believe those particular statutes apply. But it becomes, in my mind at least, important in that insofar as the adverse possession claim goes, we believe, I believe, that the analysis needs to begin with the plaintiff, Nancy Wood McKim. And what is the relationship, adverse or otherwise, is between my client's conduct as that of taking possession and her and her mom and her granddad. And that is, to me, clear and clearly adverse. So I'm afraid I'm going to give you belaboring points, and I certainly don't mean to do that to the Court. We appreciate the Court's attention. I think the Court understands that after my client was on this ground for 40-some years, it was a bitter pill to swallow at the trial court level. Thank you for your attention. Thank you. Okay. Counsel? Mr. Court, I hate to suggest that the Court had the good fortune to hear a case today where, as I explained to my client when she asked why my brief, the appellate brief was so brief, that Judge Schwarm had rendered an opinion that was the proverbial thorough of great fuss. Very, very comprehensive, volcanic, consistent with the unequivocal evidence. And, consequently, I don't have to try and, and it would be absolutely wrong for me to pontificate and muddy the water and obscure this judicial court. He went step by step through every element of adverse possession, starting with the initiation of the constructive possession by two of the co-owners. Classic, as he found, it was the classic landlord-tenant situation where the owners who lived in other counties and other states have to maintain possession through a tenant. What made this unusual is that the tenant was given absolutely free reign and free ride. Didn't have to pay any lease, didn't have to pay the taxes. It was an amazing benefit to the defendant. The case is a classic snapshot of what makes this a great country. Back in the 1880s, when the Cubs were still winning World Series, for heaven's sakes, Thomas Hubert moves onto the ground. He pays $50 for 48 hours. He probably got a view thrown in. The deed doesn't say that. It's a very, very divergent and fractured family. The original Tom Hubert, from what evidence we have, had three spouses. One of whom was the grandmother of the defendant. None of these three spouses ever appeared on record title. He had not less than eight children, they think nine, with one born out of wedlock. This was a very busy immigrant. Some of the children stayed in Germany. Some of them stayed in New York where he first settled when he came to America. And some of them were born and stayed in Jasper County until the next generation. One of his children was Thomas Hubert. Same name. They didn't ever use an initial. They didn't ever use the designation senior or junior. So the last deeds of record, as clearly pointed out by Judge Schwarm, were in 1911 through 1913. Thomas Hubert, who we believe to be the son, received deeds from other siblings who seemed to be the siblings living in Jasper County. Ninety-seven years go by without any other evidence of transition of ownership on the record title. A phenomenal situation. My father is five generations down the line. Thomas Hubert, the original, was a great, great, great grandfather. Amazing. When the second Thomas Hubert, he doesn't have quite as an extensive family. He has only two spouses and eight children. As you can imagine, raising eight children on 40 acres in Jasper County during the Depression caused those eight children to scatter to the wind immediately. Before the last able-bodied child deserved the farm, Thomas Hubert's second wife, Susan Hubert, made Henry Hubert promise that he would never let the property sell for taxes. And there was testimony about that. Exactly. That the judge heard. They made all kinds of sacrifices for an extended period of time. So when Henry Hubert goes to Detroit to work on the auto assembly lines, he makes that promise to his mother, fulfills it. So we have 67 years of tax payment by the landlords. The taxes run up from $22 eventually through $235. When Henry Hubert gets old, and Henry never married, never had any children, but his brother, who had also gone to Detroit to get a car job, and had one daughter who was the mother of the plaintiff, when he was getting old, he said, I will leave you, as he did in his will, my interest in the Jasper County farm, but you have to promise to pay the taxes. As Mr. Clark said, when Henry Hubert, who was called Uncle Honk by the defendant, so this was all pretty collegial. When Henry Hubert died, the defendant paid the taxes as he promised Henry, and those were immediately reimbursed without objection, and without any statement of, you know, I pay the taxes because it's mine. So the plaintiff's mother had a very close relationship also with the defendant, and as Judge Warren found, clearly the evidence showed that he sent her Christmas cards even after she died. So here we have an extremely fractured title. My client gets color of title by warranty deed from her mother, who felt intuitively that she owned this 40 acres in Jasper County by reason of the efforts her uncle Henry and she had made in paying taxes for 67 years, which Judge Warren found to be the most credible incident of ownership and claim of ownership. So when my client gets color of title, lo and behold, I've been practicing law for 40 years, I didn't know there was a 75-year statute of limitations against all claims on title that had not been placed to record during that 75-year history. Lo and behold, it's applicable here. I can find two cases that ever cited to application of or non-application of that statute. Judge Warren found clearly, logically, and unequivocally that that 75 years cut off all issues. Further, because there's a 40-year statute, he set that apart as well. So we get this classic application of law to cure and to quiet a title when all the evidence indicates that's the logical thing to do. What's your response to the defendant's contention that the plaintiff's complaint contains a judicial admission? When we started trying to identify co-owners, we had no success. As the record shows, when we published, we had one prospective or proposed co-owner appear. Judge Warren was very careful in addressing whether or not she was going to participate. She indicated she talked to a couple of lawyers, both of whom said she would spend way more money than could ever conceivably be recovered. So she just wanted to be there to meet her present. So when we did the pleading, we thought perhaps we would have to allege some act of ouster, as co-tenant has to do in order to claim adverse possession against other co-tenants. When it became clear that we didn't have to oust any co-tenants, they had done so by application of the statute of limitations, it never became an issue, never became an item of proof, and the fact that possibly a co-tenant would oust the other co-tenants by reason of making a gift to the other co-owners, by reason of making a gift to the tenant that says, here, you can have this valuable 40 acres, 15 acres total, and you don't have to pay us any rent. To me, that's an act of ouster against co-owners. Obviously, Henry Huber knew there were so many Hubers in the chain of title that it wouldn't be worth receiving whatever $1,000 a year rent to try and fracture that among probably 400 owners by that time. So that was not an admission of anything in respect to adverse possession by a tenant. That was simply a pleading, which I believe we could have certainly proven, had it been necessary, that putting a tenant in for 45 years without asking the tenant to pay any tax, any rent, is an act of ouster against your co-owners. Whatever, 45 years of rent is a substantial number, even if it gets split out 400 ways. So certainly that is not any kind of admission that is relevant to the issue between the plaintiff and defendant, where the defendant is somehow trying to structure a theory of adverse possession. Judge Schwarm, again, was very, very clear, went through seven different reasons why this falls so remarkably short of the clear and convincing evidence necessary to prove adverse possession. And then, once he found that the law clearly says my client's title is clear, he went on to recite that equity reinforces exactly that finding because I can't imagine, I don't think I would want to know what my family has spent on residential occupancies during the last 45 years of my life. Here's a gift being made from the plaintiff and her predecessors to the defendant and the equities of this situation. They make that gift while they persevere and bear the burden of annual tax payments consistently for 67 years. So Judge Schwarm finds that the law is clear and it is very, very strongly supported by the equities of this particular case. And I promise to try and be brief. That's really all I have to say. Well, for the record, Mr. Berkey, the Cubs still seem to beat the Cardinals down here. There are still some good people that have faith in the Cardinals. Thank you. Mr. Clark. Just briefly, Your Honors. In connection with the family real estate tax issue, two things. First of all, adverse possession, there are two different types of adverse possessions. As the Court knows, there's 20 years or less of a period of time of paying the taxes. So the fact that my client did not pay the real estate taxes is not fatal to explain adverse possession. Second of all, the evidence is in the transcript of page 198 that the plaintiff herself testified that she knew my client, James Schettenbauer, was claiming ownership of this property in 1986 when he paid taxes on it. So she knew for over 20 years that he was claiming ownership because he tried to pay taxes on it. So that's, to me, a significant point. Mr. Berkey properly and appropriately talks about the equities of the case. But ultimately, the equities of the case, or the facts of the case, are that my client and his family occupied this property for 40-plus years. The evidence was that the plaintiff was on this 40-acre tract one time in her lifetime for probably less than an hour. We believe the equity, you know, and I know we're, you know, I'm talking to the Court here and I, so that's enough. Enough said. Thank you, Your Honors. Thank you for your time. Thank you. At this time, the Court will be in a short recess. All rise.